IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| DALE W. SHEELER, | * | |
| Plaintiff, | * | |
| vs. | * | Civil Action No.: 11-cv-02444-MJG |
| WILMINGTON TRUST, FSB, | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF DEFENDANT WILMINGTON TRUST FSB'S
<u>MOTION TO DISMISS CLASS ACTION COMPLAINT</u>**

## Table of Contents

**Page**

I.     INTRODUCTION.................................................................................................1

II.    FACTUAL ALLEGATIONS .............................................................................3

III.   STANDARD OF REVIEW ...............................................................................5

IV.   ARGUMENT ......................................................................................................6

A.    Plaintiff's Claims Are Preempted By Federal Law. ......................................6

      1.     HOLA Demonstrates A Broad Intent To Displace State Law.....................7

      2.     The OTS Has Issued Regulations Expressly Preempting State Law. ...........8

      3.     CLEC's Disclosure Requirements Are Preempted Under HOLA, The OTS Regulations, And The Relevant Case Law. ................................................10

            a.     Plaintiff Is Relying On CLEC To Alter The "Terms Of Credit."...................11

            b.     Repossession Fees Are "Loan Related Fees" Within The Meaning Of 12 C.F.R. § 560.2(b)(5).........................................................................................12

            c.     Repossession Notices Are Credit-Related Documents Within The Meaning Of 12 C.F.R. § 560.2(b)(9)........................................................................................13

      4.     The Fact That Wilmington Acquired Plaintiff's RIC By Assignment Does Not Change The Preemption Analysis. ..............................................................16

      5.     Because Plaintiff's CLEC Claims Fail As A Matter Of Federal Law, His Other Claims Which Rely On The Application Of CLEC Likewise Fail. ..........................18

B.    In Addition To Being Preempted, Plaintiff's Claims For Breach Of Contract, Declaratory Judgment, Restitution And Unjust Enrichment And Violation Of The CPA Fail To State A Claim Upon Which Relief Can Be Granted. ..........................................................19

      1.     Plaintiff's Breach Of Contract Claim Fails Because Maryland Law Does Not Permit Such Claims When They Are Based On A Term Involuntarily Incorporated Into The Contract.........................................................................................................19

      2.     Plaintiff Is Not Entitled To The Declaratory Relief He Seeks As A Matter of Law..22

      3.     Plaintiff's Claims For Unjust Enrichment And Restitution Are Subject To Dismissal Due To The Existence Of A Contractual Relationship Between Plaintiff And Wilmington. .......................................................................................................26

**4.      Plaintiff Has Failed To State A Viable Claim Under Maryland's CPA. ....................28**

      **a.      Plaintiff's CPA Claim Fails Because A Violation Of CLEC Is Not A *Per Se* Violation Of The CPA. ...............................................................29**

      **b.      Plaintiff Has Failed To Allege Facts Showing An Actionable Misrepresentation Or Omission. ...........................................................29**

      **c.      Plaintiff's CPA Claim Is Preempted By The Fair Credit Reporting Act To The Extent The Claim Is Based On Reports To Consumer Reporting Agencies. ..........................................................................30**

**V.      CONCLUSION .................................................................................32**

1911845.4  37240/115816  08/31/2011

Defendant Wilmington Trust FSB[1] ("Wilmington"), by and through its undersigned counsel, submits this memorandum of law in support of its motion to dismiss the class action complaint filed by plaintiff Dale W. Sheeler.

## I.    INTRODUCTION

Plaintiff bought a new Ford Fusion in July 2009.  He financed the purchase of the vehicle with a retail installment sales contract that was subsequently assigned to Wilmington.  Approximately one year later, plaintiff defaulted on his monthly payments.   After giving plaintiff an opportunity to cure his default, Wilmington repossessed plaintiff's vehicle on September 14, 2010 and then sold the vehicle sometime after October 7, 2010 for $10,900, leaving a deficiency of $11,258.14.  Plaintiff claims that the deficiency balance owed to Wilmington was automatically extinguished because the repossession and sale notices Wilmington sent him did not contain certain information identified in Maryland's Credit Grantor Closed End Credit Provisions ("CLEC"),  Md. Code Ann., Com. Law II ("CL") §§ 12-1001, *et seq*.  Specifically, plaintiff claims that the notices did not provide adequate notice of sale, impermissibly demanded the payment of certain fees and did not provide a full accounting of the sale as allegedly required by CL § 12-1021.  Plaintiff claims that if the repossession and sale notices do not strictly comply with Maryland's statutory requirements, he is entitled to seek draconian relief under CLEC, which, in his view, permits him to not only escape liability for the outstanding deficiency on his debt, but also receive a windfall equal to three times the amount of interest, costs, fees and other charges he paid on the debt.  Plaintiff also asserts piggyback claims for (i) breach of contract, (ii) declaratory and

---

[1] Through a series of acquisitions, mergers and name changes, Wilmington Trust FSB no longer exists and is now Wilmington Trust, N.A., a federally chartered national bank headquartered in Wilmington, Delaware.  At all relevant times in the complaint, however, Wilmington Trust FSB existed as a federally chartered savings association.

injunctive relief, (iii) restitution and unjust enrichment, and (iv) violation of Maryland's Consumer Protection Act ("CPA").

The flaw in plaintiff's theory is that the Maryland loan provisions upon which he bases all of his claims do not apply to Wilmington. At all relevant times, Wilmington was a federally chartered savings association and, as such, was subject to regulation by the Office of Thrift Supervision ("OTS").[2] The OTS has promulgated comprehensive regulations under the Home Owners Loan Act ("HOLA"), 12 U.S.C. §§ 1460, *et seq.,* which expressly preempt the state laws plaintiff seeks to enforce here against Wilmington. Specifically, the HOLA regulations preempt any state law that impairs or affects the lending operations of a federal savings association, including its "terms of credit," its treatment of "loan-related fees," and its "disclosures." Because plaintiff's state law claims seek to intrude upon each of these areas and because OTS's regulations govern "the powers and operations of every Federal savings and loan association from its cradle to its corporate grave," *Fidelity Federal Savings And Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 159-60 (1982), the application of CLEC to Wilmington is preempted as a matter of federal banking law. Consequently, the entire complaint fails and must be dismissed.

Plaintiff's derivative claims fail for additional, separate and independent reasons: (1) the breach of contract claim fails because the reference to CLEC in plaintiff's contract was mandated by state law and was not a voluntary undertaking; (2) CLEC does not support the declaratory relief plaintiff seeks; (3) the claim for restitution and unjust enrichment fails by virtue of the existence of a written agreement between the parties; and (4) the CPA claim fails because a violation of CLEC is not a *per se* violation of

---

[2] Title III of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, 124 Stat. 1376, transferred all of the powers, authorities, rights and duties of the OTS primarily to the Office of the Comptroller of the Currency. This transfer was effective July 21, 2011. However, this legislation expressly continues in effect all OTS "regulations, interpretive rules, other interpretations, guidelines, procedures, and other advisory materials" in effect on July 20, 2011. Dodd-Frank § 316(b), to be codified at 12 U.S.C. § 5414.

the CPA, plaintiff does not allege an actionable misrepresentation or omission, and the claim, or at least part of it, is preempted by the federal Fair Credit Reporting Act.

For these reasons, as discussed more fully below, plaintiff's complaint is subject to dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.      FACTUAL ALLEGATIONS

On July 11, 2009, plaintiff purchased a new 2009 Ford Fusion from Deer Automotive Group. Compl., ¶¶ 10-11.  Plaintiff financed the purchase through a retail installment sales contract (the "RIC") that obligated him to make 75 equal monthly payments of $421.03, starting on August 10, 2009.  *Id.,* and Ex. A (RIC) thereto. [3]

The RIC contains two provisions of particular relevance to this motion.  First, it states that "Federal law and Maryland law apply to this contract.  This contract shall be subject to the Credit Grantor Closed End Credit Provisions (Subtitle 10) of Title 12 of the Commercial Law Article of the Maryland Code."  Compl., ¶ 10, and Ex. A (RIC, ¶ 6) thereto.  Second, the RIC contains default provisions that grant the holder, upon the borrower's default, the right to (i) repossess the vehicle; (ii) sell the vehicle and apply the money from the sale, less expenses, to the amount owed; and (iii) obtain a deficiency judgment against plaintiff if the sale proceeds are insufficient to pay all amounts owed.  Ex. A (RIC, ¶¶ 3.d and 3.f) to Compl.

After plaintiff executed the RIC, Deer Automotive Group assigned the contract to Wilmington, a federal savings association.  Compl., ¶ 10 and Ex. A thereto.  A little more than one year after executing the RIC, plaintiff was in default of his payment obligations.  Compl., ¶ 12, and Ex. B thereto.

---

[3] Plaintiff does not allege nor could he allege that Wilmington drafted or was involved in any respect with the preparation of the RIC.  The RIC was drafted by Reynolds and Reynolds, a legal forms company that holds a copyright on the form. *See* Exhibit A to Complaint.

Consequently, on September 14, 2010, Wilmington repossessed its collateral - the Ford Fusion.  Compl., ¶ 12.  Two days later, Wilmington sent plaintiff a letter by certified mail, return receipt requested, advising him that it had possession of his vehicle and that he had fifteen (15) days from the date of receipt of the letter to "redeem and retake possession of the vehicle."  Compl., ¶¶ 13-14 and Ex. B thereto.  Plaintiff did not redeem and retake possession of the vehicle.  Nor does he allege that he made any effort to do so.  As a result, on October 1, 2010, Wilmington sent plaintiff another letter by certified mail, return receipt requested, informing him that Wilmington would sell his vehicle in a private sale sometime after October 7, 2010 in an attempt to recover its losses.  Compl., ¶¶ 17-18 and Ex. C thereto.  Wilmington subsequently sold the vehicle and the sale proceeds were insufficient to cover the entire amount of plaintiff's debt.  Compl., ¶¶ 19-20 and Ex. D thereto.  Accordingly, plaintiff remained liable for the deficiency balance of $11,258.14.  Compl., ¶ 20 and Ex. D thereto.

Plaintiff filed the instant action on June 6, 2011, alleging that the notice of sale and notice of deficiency were inadequate under Maryland law.[4]  Specifically, plaintiff claims that the notices failed to comply with CLEC because they did not provide him with sufficient advanced notice of the sale or the time and street address at which the private sale of the vehicle was to be conducted and impermissibly assessed fees related to the repossession.  Compl., ¶¶ 26 & 31.  Plaintiff also contends that the notices failed to comply with CLEC because they did not include certain information regarding the sale of the collateral such as the name and address of the purchaser, the number of bids sought and received, and the expenses incurred in connection with the sale.  *Id.*, ¶ 27.  Based on these alleged violations, plaintiff asserts claims under CLEC, for breach of contract, restitution and unjust enrichment, and violation of the

---

[4] Plaintiff challenges the adequacy of these notices despite the fact that he "voluntarily surrendered" the vehicle because he could no longer afford to make the agreed-upon monthly payments.

CPA.  *Id.*, ¶¶ 54-62 and 74-88.  Plaintiff seeks declaratory and injunctive relief in addition to statutory damages.  *Id.*, *ad damnum*, ¶¶ C-F.  Plaintiff contends that CLEC authorizes him to avoid repayment of the deficiency balance in the amount of $11,258.14 and to receive <u>three times</u> the amount of interest and other fees and charges he paid during the approximate fourteen (14) months he had use of the car.  *Id.*, ¶¶ D-F.

### III.       <u>STANDARD OF REVIEW</u>

Dismissal under Rule 12 of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's claims are preempted by federal law.  *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1191 (2d Cir. 1996); *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1034 (9th Cir. 2008) (federal preemption is a question of law and is properly resolved at the pleading stage).

In evaluating the sufficiency of pleadings, the Supreme Court has instructed that mere "legal conclusions" are not entitled to the assumption of truth, and that a claim must be plausible to survive a motion to dismiss.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007)).  *Twombly* held that Fed. Rule of Civil Procedure 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me-accusation."  *Iqbal*, 129 S. Ct. at 1949.  A "'pleading that offers labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' will not do."  *Id.* (quoting *Twombly*, 550 U.S. at 557).

When considering a Rule 12(b) motion, the Supreme Court instructed lower courts to consider "[t]wo working principles."  *Iqbal,* 129 S. Ct. at 1949.  *First*, a court is not bound to accept as true legal conclusions couched as factual allegations.  To the contrary, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 1949.  *Second*, "[t]o

5

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is ***plausible on its face***.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570) (emphasis added).  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).  An important policy reason for this pleading standard is the protection of litigants, and courts, from protracted litigation and excessive discovery costs. *Twombly*, 550 U.S. at 558-59

In short, under *Iqbal* and *Twombly*, a complaint must contain direct and plausible allegations supporting all material elements necessary to sustain recovery under a viable legal theory in order to survive a motion to dismiss under Rule 12(b)(6).  A complaint should be dismissed, when, on its face, the complaint is devoid of facts necessary for the plaintiff to prevail under the causes of action asserted, or when the complaint itself discloses facts that necessarily defeat the causes of action pled.

## IV.    ARGUMENT

### A.    Plaintiff's Claims Are Preempted By Federal Law.

Every cause of action plaintiff asserts against Wilmington is based solely on the contention that Wilmington failed to comply with disclosure requirements for repossession and sale of collateral set forth in CLEC.  However, CLEC's disclosure requirements cannot be applied to federal savings associations, such as Wilmington, whose lending activities are governed by federal law to the exclusion of all other state laws.  HOLA vests the OTS with authority to regulate federal savings associations.  Pursuant to that congressionally-delegated authority, the OTS has promulgated regulations that expressly preempt the state-law claims plaintiff attempts to assert here.  Accordingly, all of plaintiff's

claims are deficient as a matter of federal law, and the complaint must be dismissed pursuant to Fed. R. Civ. P. 12 (b)(6).

**1.    HOLA Demonstrates A Broad Intent To Displace State Law.**

Congress enacted HOLA to create an industry of nationwide lending institutions free from state control.  In HOLA, Congress gave the regulator "plenary authority" to regulate the operations of federal savings associations.  *de la Cuesta*, 458 U.S. at 141.  HOLA directs the OTS to "provide for the organization, incorporation, examination, operation and regulations of . . . Federal savings associations." 12 U.S.C. § 1463(a).  As the Supreme Court has observed, "[t]he broad language of [12 U.S.C. § 1463(a)] expresses no limits on the Board's [OTS's] authority to regulate the lending practices of federal savings and loans."  *de la Cuesta*, 458 U.S. at 161 (stating "Congress plainly envisioned that federal savings and loans would be governed by what the Board [OTS] – not any particular State – deemed to be the best practices.").  Pursuant to this broad authority, the OTS has "promulgated regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave."  *Id.* at 145 (internal quotation marks and citation omitted).  These regulations have the same preemptive force as statutes, *id.* at 153-54, and courts interpreting them have determined that "regulation of federal savings associations by the OTS is so pervasive as to leave no room for state regulatory control."  *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 560 (9th Cir. 2002) (citation and internal quotations omitted).

HOLA and its implementing regulations thus sweep broadly, occupying the entire field of regulating federal savings associations, their operations, and their powers with respect to lending-related activities.  As one court recently summarized the preemptive effect of HOLA and the OTS's regulations, "if a [state] law of general application requires a thrift and savings bank to affirmatively change its

practices, it is preempted."  *Guadagno v. E\*Trade Bank*, 592 F. Supp. 2d, 1263, 1273 (C.D. Cal. 2008).

Federal preemption, and the override of state law, serves the important policy identified by Congress of

assuring that federally chartered savings associations can operate across state lines without the need to

conform to diverse operational differences of multiple state laws.  The repossession notice practices that

are the subject of this action are a prime example of the need for preemption.  If each state where a

federal savings association operates could impose its own unique notice preferences on the savings

association, the result would be a crazy-quilt of requirements significantly and adversely impacting the

savings association's business and making its operations across state lines unnecessarily complicated

and costly.

      **2.**        **The OTS Has Issued Regulations Expressly Preempting State Law.**

The OTS regulations set forth the analytical framework that should be utilized to determine

whether a state statute, regulation, ruling, order or judicial decision is preempted.  The regulations

explicitly provide that the OTS occupies the entire field of lending regulation:

> (a)  Occupation of field.  Pursuant to sections 4(a) and 5(a) of the
> HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to
> promulgate regulations that preempt state laws affecting the
> operations of federal savings associations . . . ***OTS hereby
> occupies the entire field of lending regulation for federal savings
> associations***. OTS intends to give federal savings associations
> maximum flexibility to exercise their lending powers in
> accordance with a uniform federal scheme of regulation.
> Accordingly, ***federal savings associations may extend credit as
> authorized under federal law, including this part, without regard
> to state laws purporting to regulate or otherwise affect their
> credit activities*** . . .

12 C.F.R. § 560.2(a) (2010)[5] (emphasis added).

Subdivision (b) of Section 560.2 provides a list of thirteen "illustrative examples" of state law that are preempted as applied to federal savings associations. *Id.*, § 560.2(b). Three of these examples directly capture plaintiff's claims here:

> [T]he types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:
>
> \*       \*       \*
>
> (4) The ***terms of credit*** . . . including the circumstances under which a loan may be called due and payable . . .
>
> (5) ***Loan-related fees***, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;
>
> \*       \*       \*
>
> (9) ***Disclosure*** and advertising, ***including laws requiring specific statements, information, or other content to be included in*** credit application forms, credit solicitations, billing statements, credit contracts, or ***other credit-related documents*** . . .

*Id.*, § 560.2(b) (emphasis added). While the "illustrative examples" do not make specific reference to repossession, the list was not intended to be exhaustive and the failure to mention a particular type of state law that affects lending was not meant to indicate such types of state laws were applicable to federal savings associations. 61 Fed. Reg. 50,966 (Sept. 30, 1996). The United States District Court for the Northern District of Ohio addressed this specific issue in *Crespo v. WFS Financial, Inc.*, 580 F. Supp. 2d 614 (N.D. Ohio 2008) and found "that a post-repossession notice constitutes a 'credit-related

---

[5] The OTS regulations provide for only two exceptions to federal preemption in the lending field. 12 C.F.R. § 560.2(a). First, certain aspects of state usury laws apply equally to federal thrifts as they do to a state's own institutions. *Id.*, § 560.110. Second, there are six species of state law that are not preempted so long as they "only incidentally affect the lending operations of Federal savings associations." *Id.*, § 560.2(c). Those categories are contract law, real property law, homestead laws, tort law, criminal law, and other state laws that the OTS specifically approves upon review. *Id.* The state laws that plaintiff seeks to invoke do not fall under any of these exceptions.

document'" within the meaning of Section 560.2(b)(9) and therefore dismissed "plaintiffs' various claims alleging that Defendant violated state laws by not including certain information on the post-repossession notice" on the basis of HOLA preemption.  580 F. Supp. 2d at 623.

When determining the preemptive reach of Section 560.2, the OTS provides the following instructions for courts to follow:

> When analyzing the status of state laws under § 560.2 the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. ***Any doubt should be resolved in favor of preemption***.

61 Fed. Reg. 50,951, 50,966-67 (emphasis added); *see also Silvas v. E*Trade Mort. Corp.,* 514 F.3d 1001, 1006 (9th Cir. 2008).  "Consequently, where a law is found to fall under 560.2(b), which lists examples of the types of laws preempted by 560.2(a), it is expressly preempted and the preemption analysis ends."  *Crespo*, 580 F. Supp. 2d at 623.  As discussed below, the application of CLEC to Wilmington is preempted by Section 560.2(b).

**3.    CLEC's Disclosure Requirements Are Preempted Under HOLA, The OTS Regulations, And The Relevant Case Law.**

Plaintiff's state law claims seek to impose certain disclosure requirements on Wilmington when it forecloses on its security interest and to limit the costs Wilmington can recover when retaking possession of its collateral security.  In essence, plaintiff is attempting to impair Wilmington's ability to collect on its loans.  Such attempts are prohibited by Section 560.2, as the OTS "occupies the entire field of lending regulation for federal savings associations" and has preempted all state laws that more than "incidentally affect the lending operations of Federal savings associations."  *Haehl v. Washington Mut.*

10

*Bank, F.A.*, 277 F. Supp. 2d 933, 940 (S.D. Ind. 2003).  It is difficult to imagine anything that would interfere with a bank's lending operations more than preventing it from collecting the remaining balances owed on its loans.  One of the primary functions of banks is to make loans and secure repayment of those loans.  State laws that purport to interfere with a bank's ability to foreclose on its collateral and secure repayment of the sums it has lent impermissibly interfere with the bank's lending operations and therefore are preempted as a matter of federal law.  *See Chaires v. Chevy Chase Bank, FSB*, 748 A.2d 34, 46-47 (Md. Ct. Spec. App. 2000) (concluding that HOLA preempted a Maryland-law-based challenge to a federal savings association's assessment of inspection fees because collateral requirements are "an integral part of a federal savings association's lending operations").

Here, plaintiff's state law claims: (i) attempt to alter the "terms of credit" between plaintiff and Wilmington; (ii) purport to prohibit Wilmington from demanding certain fees in its repossession notices; and (iii) seek to regulate Wilmington's disclosures and credit related documents.  All of these claims squarely fall within the "illustrative examples" of OTS regulation Section 560.2(b) and are therefore preempted under HOLA.

### a.   Plaintiff Is Relying On CLEC To Alter The "Terms Of Credit."

Plaintiff's loan agreement entitles Wilmington to repossess and sell plaintiff's vehicle in the event of plaintiff's default.  *See* Ex. A (RIC, ¶¶ 3.d and 3.f) to Compl.  It also entitles Wilmington to repayment of the entire balance of plaintiff's loan in the event the sale proceeds are insufficient to pay all amounts owed.  *Id.* (RIC, ¶ 3.f).  Relying on CLEC, plaintiff is now seeking to escape his contractual liability by contending that because Wilmington allegedly did not comply with certain technical disclosure requirements of Maryland law, plaintiff is no longer obligated to repay the principal balance of his loan.  Compl., ¶¶ 29-30.  In essence, plaintiff is seeking to use the disclosure requirements of

11

CLEC to impair Wilmington's right to enforce its security interest upon default and to obtain a deficiency judgment.  Plaintiff cannot rely on Maryland law to impose "terms of credit" that impact Wilmington's ability to collect on its delinquent loans.  Wilmington's right to repayment of its loan and its ability to enforce that right are "terms of credit" subject to preemption by Section 560.2(b)(4).  *See Abel v. KeyBank USA*, 313 F. Supp. 2d 720, 727-28 (N.D. Ohio 2004) (finding federal preemption of Ohio statute imposing credit terms concerning defenses to repayment on national banks under regulation analogous to Section 560.2).

> **b.   Repossession Fees Are "Loan Related Fees" Within The Meaning Of 12 C.F.R. § 560.2(b)(5).**

Plaintiff's claims are similarly preempted to the extent plaintiff contends that CLEC prohibits Wilmington from demanding certain fees in its repossession notices.  Compl., ¶ 31.  Section 560.2(b)(5) specifically provides that state laws regarding "loan related fees" are preempted.  Courts have interpreted the term "loan related fees" in HOLA to encompass a broad spectrum of fees, including repossession fees.  *See Crespo*, 580 F. Supp. 2d at 622-23 (finding that "Plaintiff's claim that Defendant violated state law by listing an improper repossession fee due is expressly preempted by federal law [12 C.F.R. § 560.2(b)(5)]"); *see also Boursiquot v. Citibank F.S.B.*, 323 F. Supp. 2d 350, 352 (D. Conn. 2004) (holding that a state-law claim challenging a $90 "fax/statement" fee charged by federal savings association "fall[s] squarely within" Section 560.2(b)'s list of preemptions); *Haehl*, 277 F. Supp. 2d at 941 (reconveyance fee preempted as a "loan-related fee").  Accordingly, plaintiff's claim that Wilmington violated CLEC by seeking repossession costs without providing "the discretionary notice prior to repossession" is expressly preempted by HOLA.  *Crespo*, 580 F. Supp. 2d at 623 ("[A]s repossession is a routine component of the loan process, fees for the cost of repossession are just as common as fees for any other part of the loan process.").

      c.      **Repossession Notices Are Credit-Related Documents Within The Meaning Of 12 C.F.R. § 560.2(b)(9).**

Section 560.2(b)(9) also compels the conclusion that plaintiff's claims are preempted.  The gravamen of plaintiff's claims turns on the notices or disclosures Wilmington sent.  Plaintiff claims that the notices were deficient because (1) they did not provide plaintiff with 10 days notice of sale or disclose the time and street address at which the private sale of the vehicle was to be conducted, allegedly in violation of CL § 12-1021(j)(1)(ii) (Compl., ¶ 26); (2) they stated redemption payoff amounts that included fees related to the repossession, allegedly in violation of CL § 12-1021(h)(3) (Compl., ¶ 31); and (3) they did not include certain information regarding the sale such as the name and address of the purchaser, the number of bids sought and received, and the expenses incurred as a result of the sale, allegedly in violation of CL § 12-1021(j)(2) (Compl., ¶ 27).  The aforementioned repossession and sale notices are "credit-related documents" because "the purpose of such a notice is to notify a debtor that his or her credit was revoked and that the collateral with which the debtor secured the credit is being [and has been] sold, as well as to inform the debtor what he or she needs to pay in order to restore his or her credit" or to payoff the deficiency.  *Crespo*, 580 F. Supp. 2d at 623; *see also Silvas*, 514 F.3d at 1005-06 (holding that 12 C.F.R. § 560.2(b)(9) expressly preempts state law purporting to regulate disclosures).  Accordingly, plaintiff's claims that Wilmington violated Maryland law (i.e., CLEC) by not including certain information in its repossession and sale notices are preempted by Section 560.2(b)(9).

This conclusion is supported by an opinion of the OTS in which the OTS found preemption applied not only to laws purporting to regulate the documents generated during the formation of the credit relationship, but also to state law provisions triggered upon default on the loan.  Specifically, the OTS issued a legal opinion in 2003, advising that a federal savings association was not subject to New

Mexico's Home Loan Protection Act ("NM Act").  A copy of the OTS General Counsel's September 2, 2003 letter of advice (P-2003-6) is attached as **Exhibit 1**.  The NM Act included provisions "triggered upon default on high-cost home loans rather than at loan origination."  Ex. 1, OTS General Counsel's September 2, 2003 letter of advice, at p. 3.  Specifically, the provisions required creditors to accept any partial payment made or tendered in response to a default notice, to reinstate the borrower to the same position as if a default had not occurred and nullify an acceleration of an obligation and prohibited charges, fees or penalties for curing a loan default.  *Id.*  The opinion of the OTS General Counsel stated, "[a]ll of these NM Act provisions — whether they are triggered at loan origination or upon default — purport to regulate the terms of credit, loan-related fees, disclosures, mortgage processing, origination, refinancing, and servicing, and disbursements. Thus, they are preempted from applying to federal savings associations" under Section 560.2(b).  *Id.* & n.4.  The OTS's interpretation of its own regulation is binding and applicable here.  *Auer v. Robins*, 519 U.S. 452, 461 (1997).

Federal courts interpreting OTS regulation Section 560.2 (and its OCC analog, 12 C.F.R. § 7.4008(d)(2), applicable to national banks) likewise have concluded that statutes that impose on federal savings associations (and national banks) repossession notice requirements similar to those provided in CLEC are preempted.  For example, in *Crespo v. WFS Financial, Inc.*, the Northern District of Ohio held that the post-repossession notice requirement set forth in Ohio's Retail Installment Sales Act ("RISA") was preempted under Section 560.2.  580 F. Supp. 2d at 622-23.  After defaulting on their installment automobile loans, the plaintiffs in *Crespo* claimed that the post-repossession notice they received was missing information required under RISA, and, consequently, WFS Financial, a subsidiary of a federal savings association, could not seek a deficiency.  *Id.* at 616.  The district court disagreed, holding that because a post-repossession notice is a "credit-related document," the Ohio law regulating

14

the content of such notices was preempted under Section 560.2(b)(9).[6]

    Judge Nickerson of this Court reached the same conclusion applying OCC's preemption regulations to CLEC's unique disclosure requirements.  *Epps v. JP Morgan Chase Bank, N.A.*, Civ. Action No. WMN-10-1504, 2010 WL 4809130 (D. Md. Nov. 19, 2010), *appeal docketed*, 10-2444 (4th Cir. Dec. 30, 2010).  In *Epps,* Judge Nickerson found that a state law that prescribes the contents of repossession-related disclosures and that voids a creditor's security interest if that disclosure fails to provide a particular piece of information "directly regulates the disclosure practices of national banks" and therefore is preempted under 12 C.F.R. § 7.4008(d)(viii).  2010 WL 4809130, at *3 (quoting *Aguayo v. U.S. Bank*, 658 F. Supp. 1226 (S.D. Cal. 2009)).[7]  In reaching his decision, Judge Nickerson rejected Epp's argument that CLEC was rescued from preemption by 12 C.F.R. § 7.4008, which saves from

---

[6] The same conclusion was reached by the California Court of Appeals in *WFS Financial, Inc. v. Superior Court*, 44 Cal. Rptr. 3d 561 (Cal. Ct. App. 2006), when it applied HOLA preemption to a similar California statute.  The opinion, however, was perfunctorily depublished as a result of the plaintiff's appeal to the California Supreme Court (see Cal. R. Ct. 8.1105) and then the matter settled before the appeal was heard.  Although not binding on this court and notwithstanding the status of the opinion, the court's decision in *WFS Financial* is well reasoned and instructive.  In that case, the plaintiff sought to collect a deficiency owed on a retail installment sales contract after the car was repossessed and sold.  The borrower alleged that WFS Financial had not complied with state law disclosure requirements and filed a class action counter-complaint asserting that WFS Financial's practice of seeking a deficiency after issuing defective notices was an unfair business practice.  After a lengthy analysis of preemption, HOLA, and Section 560.2, the court concluded that the "statutes, regulations, and comments of the OTS make abundantly manifest and clear the congressional intent to expressly preempt state law in the area of lending regulation of federal savings associations."  44 Cal. Rptr.3d at 568.  The court concluded that "post-repossession debt collection activities" are part of "lending operations" and therefore the plaintiff's claims were preempted.  The court also noted that the "laudatory purpose of the state statute is not the point and does not preclude preemption." *Id.* at 570.

[7] On August 1, 2011, the U.S. Court of Appeals for the Ninth Circuit reversed *Aguayo*.  *See  Aguayo v. U.S. Bank*, No. 09-56679, 2011 WL 3250465 (9th Cir. Aug. 1, 2011).  The Ninth Circuit held that information that must be provided under California's Rees-Levering Act in connection with a repossession did not constitute a "disclosure" and, as such, did not come within the ambit of the express preemption clause applicable to national banks.  The Ninth Circuit, however, recognized that HOLA preemption is much broader than National Bank Act preemption and therefore criticized the lower court for improperly relying on *Crespo* which applied HOLA preemption to a similar Ohio statute.  The appellate court noted that, "[b]ecause the district court had already found the Rees-Levering notices were expressly preempted under the language in 12 C.F.R. § 7.4008(d)(2)(viii), the district court refused to consider the savings clause language in Subsection (e) [of 12 C.F.R. § 7.4008] that explicitly saves '[r]ights to collect debts' from preemption."  Significantly, the corresponding OTS savings clause, 12 C.F.R. § 560.2(c), makes no such preemption exception.  Accordingly, even if this Court were to find the Ninth Circuit's decision in *Aguayo* persuasive, the decision supports Wilmington's preemption arguments here.

preemption state laws that "only incidentally affect" a national bank's lending powers.  Judge Nickerson observed that a state law, such as CLEC, that "would completely invalidate any debts where the national bank does not strictly comply with [that] law," definitely has more than an "incidental affect" on a national bank.  *Epps*, 2010 WL 4809130, at *6.

Like WFS Financial in *Crespo* and JP Morgan Chase in *Epps*, Wilmington is alleged to have provided repossession and sale notices in violation of state law addressing a repossession "disclosure . . . in . . . [a] credit related document[]."  Consequently, the reasoning in *Crespo* and *Epps* applies here with equal force and compels dismissal of plaintiff's state law claims based on federal preemption.

**4.     The Fact That Wilmington Acquired Plaintiff's RIC By Assignment Does Not Change The Preemption Analysis.**

HOLA preemption principles apply notwithstanding the fact that Wilmington acquired by assignment the RIC under which plaintiff financed the purchase of his vehicle.  HOLA expressly recognizes that federal savings associations are authorized to engage in indirect vehicle financing (12 U.S.C. §§ 1464(a) & (c)(2)(D)), which is what occurred here, and there is nothing in HOLA or OTS regulations indicating any intention to limit the broad, express preemption of state laws "affecting the operations of federal savings associations" (12 C.F.R. § 560.2(a)) to specific forms of lending or to only direct loans.

To the contrary, the OTS has taken the position that indirect vehicle finance leases that are the functional equivalent of loans "bring[] the full force of OTS's lending regulation on preemption into play."  OTS General Counsel's May 14, 2002 letter of advice at p. 5 (P-2002-4) (application of Wisconsin Motor Vehicle Consumer Lease Law to federal savings bank preempted), attached as **<u>Exhibit</u> <u>2</u>**.  "Congress intended the federal scheme to be exclusive, leaving no room for state regulation, conflicting or complementary."  *Id*.  Moreover, a number of courts have found federal preemption under

16

Section 560.2 outside the direct loan context.  *See, e.g.*, *Kelley v. Mortgage Electronic Registration Systems*, 642 F. Supp. 2d 1048, 1053-54 (N.D. Cal. 2009) (borrower's state-law claims against federal savings association assignee for conversion, fraud and violation of California's Unfair Competition Law based on statements regarding terms of mortgage loan and payment obligations were preempted by HOLA); *WFS Fin., Inc. v. Dean*, 79 F. Supp. 2d 1024, 1025 (W.D. Wisc. 1999) (Wisconsin laws governing sales finance companies preempted and could not be applied to WFS, whose business in Wisconsin was 100 percent indirect automobile loans).

If the mere assignment of the RIC to Wilmington rendered Wilmington, a federally chartered savings association, subject to CLEC's notice requirements, then by implication Wilmington would be presented with the stark contrast of either refusing to obtain any loans by assignment (which would substantially interfere with its lending activities) or being obligated to ascertain, monitor and comply with the disparate laws of all fifty states regarding the repossession and sale of collateral in order to exercise its federally granted lending powers.  Subjecting Wilmington to such a veritable "hodgepodge" of state regulation would not only be unduly burdensome, it would also be directly at odds with the very purpose behind federal regulation of federal savings associations.  *See Fidelity Fin. Corp. v. Fed. Home Loan Bank of San Francisco*, 792 F.2d 1432, 1437 (9th Cir. 1986) (HOLA shows the strong interest of Congress in a uniform system of regulation of the savings and loan industry, and empowers the Bank Board (OTS) to promulgate extensive regulations governing the administration of the savings and loans towards that effect); *Conference of Fed. Sav. and Loan Assn's v. Stein*, 604 F.2d 1256, 1258 (9th Cir. 1979) (explaining that HOLA was passed to establish uniform regulations for federal savings associations and to eliminate the "hodgepodge" of state laws that had previously governed the

associations), *aff'd*, 445 U.S. 921 (1980).   Accordingly, it is irrelevant that Wilmington acquired plaintiff's RIC by assignment.  Plaintiff's CLEC claims are preempted.

**5.**      **Because Plaintiff's CLEC Claims Fail As A Matter Of Federal Law, His Other Claims Which Rely On The Application Of CLEC Likewise Fail.**

Plaintiff's other causes of action – breach of contract, declaratory judgment, restitution and unjust enrichment, and violation of the CPA – are also preempted because they are premised entirely on the legally flawed notion that Wilmington was required to comply with CLEC's repossession and sale notice requirements.  Where a claim is predicated on an underlying state law claim that is preempted by federal law, the derivative claim is preempted as well.  *See Rose*, 513 F.3d at 1038 (dismissing all claims under California's consumer protection law because the "legal duties that underlie" the claims for "unfair" and "deceptive" business practices are "the same purported duties to disclose . . . that are preempted by the NBA and OCC regulations"); *Haehl*, 277 F. Supp. 2d at 942 (various state claims based on allegedly improper reconveyance fees preempted; tort exception under OTS regulation Section 560.2(c) inapplicable because "applying tort law in this case would more than 'incidentally affect' lending operations by imposing substantive requirements on lending operations, specifically the types on loan-related fees that a bank could charge."); *Moskowitz v. Washington Mut. Bank, F.A.*, 768 N.E.2d 262, 266 (Ill. Ct. App. 2002) (claims for deceptive business practices and breach of contract based on undisclosed mortgage payoff statement fee preempted; OTS regulation Section 560.2(c) does not exempt from preemption a deceptive trade practices claim that is based on an allegation of improper charging of loan-related fees, and "use of contract law here would more than 'incidentally affect' the lending operations"); *Chaires*, 748 A.2d 34 (state claims for unfair and deceptive trade practices based on allegedly improper loan-related fees preempted).

18

Here, plaintiff's allegations concerning the non-CLEC claims do no more than reference and reiterate Wilmington's alleged failure to comply with CLEC.  Without setting forth any new or additional supporting facts, every material paragraph: (i) refers to Wilmington's alleged failure to comply with CLEC's repossession and sale notice provisions; (ii) discusses the allegedly defective notices; or (iii) challenges Wilmington's attempts to collect certain fees and deficiency balances that plaintiff alleges were not lawfully owed due to the alleged failure to comply with CLEC.  Indeed, the complaint does not allege any unlawful, unfair or wrongful act independent of the purported failure to comply with CLEC.  Because the underlying predicate claim – a violation of CLEC – is preempted, the derivative claims for breach of contract, declaratory judgment, restitution and unjust enrichment, and violation of the CPA are likewise preempted.

**B.     In Addition To Being Preempted, Plaintiff's Claims For Breach Of Contract, Declaratory Judgment, Restitution And Unjust Enrichment, And Violation Of The CPA Fail To State A Claim Upon Which Relief Can Be Granted.**

**1.     Plaintiff's Breach Of Contract Claim Fails Because Maryland Law Does Not Permit Such Claims When They Are Based On A Term Involuntarily Incorporated Into The Contract.**

Count II of the complaint is labeled "breach of contract," but the allegations supporting the claim are grounded exclusively upon the same misguided CLEC violation alleged in Count I.  Plaintiff contends that because the RIC referred to CLEC, "[t]he provisions of the CLEC statute become a part of the contract[] just as if the parties expressly included the CLEC provisions in their credit contact[]."  Compl., ¶ 59.  Plaintiff continues and asserts that when Wilmington allegedly violated CLEC, it automatically and without doing anything more breached the terms of the RIC.  *Id.,* ¶ 60.  He is recasting his claim under CLEC, which is preempted by federal law, as a state law breach of contract claim.  That contract claim, however, does not provide plaintiff any relief.  Because CLEC **mandates** that the RIC expressly elect CLEC's application, the provision incorporating CLEC was not voluntary

19

nor was it a bargained-for term.  As such, Maryland law prohibits plaintiff from asserting offensively a

private cause of action for breach of contract based on the RIC's reference to CLEC.

Here, plaintiff did not directly finance his purchase of the 2009 Ford Fusion through

Wilmington.  Rather, he financed the purchase through a RIC with Deer Automotive Group.  Pursuant to

the RIC, Deer Automotive Group sold plaintiff the 2009 Ford Fusion in exchange for his promise to pay

the full purchase price of the vehicle, plus interest, over a period of 6 years.  Unlike federal savings

associations and national banks, car dealers, like Deer Automotive Group, cannot rely on federal law

and must look to state law for authority to charge interest and fees.  In this case, Deer Automotive Group

purchased the form RIC from Reynolds & Reynolds and did not have any input or say as to the contents

of the preprinted form.  Using the form, Deer Automotive Group relied on CLEC for its interest rate and

fee authority and, as a matter of Maryland law, had no choice but to expressly reflect this fact in the

RIC.  *See* CL § 12-1013.1(b)(2) ("If a person fails to elect [CLEC's application] in accordance with this

section to extend closed end credit under this subtitle, ***the provisions of [CLEC] do not apply***.")

(emphasis added).  Accordingly, the form agreement used by Deer Automotive Group for plaintiff's

transaction provided that "[t]his contract shall be subject to the Credit Grantor Closed End Credit

Provisions (Subtitle 10) of Title 12 of the Commercial Law Article of the Maryland Code."  Ex. A (RIC,

¶¶ 3.d and 3.f) to Compl.  Had Deer Automotive Group not expressly elected CLEC in the RIC, the RIC

would have violated Maryland law.[8]  Consequently, the reference to CLEC was involuntary as it was

[8] Had the RIC not specified CLEC applied, the RIC would have been governed by Maryland's Retail Installment Sales Act ("RISA"), CL §§ 12-601, *et seq*.  RISA requires certain "magic" language in 12-point bold type be included in every contract regarding the borrower's right to a copy of the contract and his rights of prepayment and redemption if the vehicle is repossessed.  CL § 12-606(c)(2).  Had Deer Automotive Group not used a form with the election of CLEC, the RIC would have plainly violated Maryland law because it does not contain the "magic" language in the particular font that is required by RISA.

20

mandated by Maryland law.

Maryland law is clear that contract terms forced upon a lender by law or regulation may not be used offensively as a sword against that lender.  In *Wells Fargo v. Neal*, 922 A.2d 538 (Md. 2007), a homeowner sued his mortgage loan servicer for breach of contract based on violations of regulations issued by the Secretary of Housing and Urban Development (HUD) on the theory that those regulations were incorporated by reference into the homeowner's deed of trust.  *Id.*, at 544.  The Court of Appeals rejected the claim, holding that the homeowner could not assert a breach of contract claim because the inclusion of the reference to the regulations in the contract was not "an undertaking voluntarily assumed" by the mortgage loan servicer assignee.  *Id.*, at 545.  The court reasoned that the mortgage loan servicer was "**required** to use a form deed of trust created by . . . an agency of HUD" and "did not participate in negotiations for or drafting of the deed of trust to which it became assignee."  *Id.*, at 545 (emphasis added).  In sum, because the inclusion of the reference to the HUD regulations was imposed on the mortgage loan servicer as a matter of law and was not a "bargained-for term," the court concluded that it could not be "invoked by [the homeowner] in an offensive thrust, such as a private cause of action for damages."  *Id.*, at 545.

Relying on *Neal*, Judge Nickerson reached the same conclusion when he dismissed a borrower's breach of contract claim based on an alleged violation of CLEC where the loan agreement elected the statute's application.   *Epps*, 2010 WL 4809130, at *8.   In *Epps,* the plaintiff claimed that, notwithstanding any preemption of her CLEC related claims, she can go forward with her breach of contract claim because compliance with CLEC was included as a term in the RIC.  The court disagreed and found that because the car dealer "had no choice but to include in that contract a provision calling

21

for the applicability of" CLEC, the plaintiff could not "assert a breach of contract claim based on a violation of that law." *Id.* (citing *Neal*, 922 A.2d at 545-46).[9]

In this case, plaintiff seeks to do exactly what the Court of Appeals in *Neal* and Judge Nickerson in *Epps* proscribed – "invoke[] . . . in an offensive thrust" a contractual provision calling for the application of a particular law that the assignee did not draft, bargain for or negotiate. *Neal*, 922 A.2d at 545. The inclusion of the CLEC reference in the RIC was in no way an "undertaking voluntarily assumed" nor a "bargained-for term." *Id.* CLEC is referenced in the RIC for only one reason: Maryland law requires it. Under these circumstances, plaintiff is barred from using the provision as a sword in a breach of contract action.

### 2.    Plaintiff Is Not Entitled To The Declaratory Relief He Seeks As A Matter of Law.

Plaintiff seeks a judicial declaration that Wilmington is not entitled to collect a deficiency balance against him because Wilmington allegedly did not provide repossession notices in compliance with CLEC. Compl., ¶¶ 65-66. Plaintiff is not entitled to the relief he seeks. Nothing in CLEC prohibits Wilmington from recovering a deficiency judgment against plaintiff following a *private sale*, even if the repossession or sale notices were defective.

Under CLEC, a credit grantor that repossesses a vehicle has the option of selling the vehicle at public sale or private sale. CL § 12-1021(j)(1)(i)(1)-(2). If the credit grantor elects to sell the vehicle at a public sale, the provisions of CL § 12-1021(k) control. CL § 12-1021(k)(1) ("The provisions of this subsection apply to a public sale of property . . . ."). Conversely, if the credit grantor elects to sell the

---

[9] It is important to note that the contract in *Epps* is on the same form as plaintiff's RIC.

vehicle at a private sale, the provisions of CL § 12-1021(j)(2) and (3) control.  The differences between these two provisions are material.

For a vehicle sold at a public sale, CL § 12-1021(k)(2) directs how sale proceeds are applied to the debt, CL § 12-102(k)(3) instructs the credit grantor to "furnish to the consumer borrower a written statement which shows the distribution of the proceeds," and if a credit grantor re-sells the vehicle at a public sale and does not supply the appropriate pre- or post-repossession notices, CL § 12-1021(k)(4) provides that the credit grantor "shall not be entitled to any deficiency judgment . . . ."

Private sales of repossessed vehicles are governed by markedly different requirements and procedures.  After a private sale, a credit grantor must provide "a full accounting . . . to the borrower in writing" including details like:

> • The purchaser's name, address, and business address;
>
> • The number of bids sought and received; and
>
> • Any statement as to the condition of the goods at the time of repossession which would cause their value to be increased or decreased above or below the market value for goods of like kind and quality.

CL § 12-1021(j)(2).  Further, unlike the public sale deficiency judgment prohibition described above, CL § 12-1021(j)(3) sets forth a completely different method to determine whether a deficiency may be collected after a private sale.  That section states: "The Commissioner of Financial Regulation may make a determination concerning any private sale that the sale was not accomplished in a commercially reasonable manner.  Upon that determination, the Commissioner may issue an order disallowing any claim for a deficiency balance."  CL § 12-1021(j)(3).

Here, plaintiff contends that Wilmington sold his vehicle at a private sale.  Compl, ¶¶ 17-18, and Ex. C thereto.  Nonetheless, plaintiff seeks a declaratory judgment establishing that Wilmington is

barred from obtaining a deficiency pursuant to CL § 12-1021(k)(4), a statute exclusively applicable to public sales. Plaintiff's request for declaratory relief ignores CLEC's prima facie distinction between a credit grantor's public and private sale notice and accounting obligations, and the resulting penalties, if the credit grantor errs. As explained above, CL § 12-1021(j)(2) sets forth a credit grantor's more extensive private sale accounting requirements. Subsection (j)(3) gives exclusively to the Maryland Commissioner of Financial Regulation authority to use his discretion to disallow a deficiency balance and only after he determines that a private sale was commercially unreasonable. In contrast, CL § 12-1021(k)(4) describes penalties for faulty public sale notices. *See* CL § 12-1021(k) (stating that "the provisions of this subsection apply to a public sale of property"). Thus, the CL § 12-1021(k)(4) public sale penalty statute is not, as a matter of law, available to plaintiff because he has alleged violations arising from a private sale.

CLEC's legislative history confirms that Maryland's General Assembly intended to create distinct enforcement mechanisms for non-compliant public and private sales of repossessed vehicles. When CLEC was enacted in 1983, creditors could only sell repossessed vehicles at public sales (the original 1983 CLEC is attached as **Exhibit 3**).[10] In 1987, however, Maryland expanded CLEC to allow private sales of repossessed vehicles. The law was amended to encourage higher re-sale prices, which, in turn, would benefit consumers by lowering their deficiency balances. *See Kline v. Central Motors Dodge, Inc.*, 614 A.2d 1313, 1317 (Md. 1992). Recognizing that private sales could yield commercially unreasonable results, the legislature enacted consumer protections such as: (1) requiring the lender to give a "full accounting;" and (2) establishing the CL § 12-1021(j)(3) administrative procedure

---

[10] Attaching the original CLEC version is permitted and does not convert this motion into one for summary judgment. *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995) (legislative history of an ordinance is not a matter beyond the pleadings), *vacated on unrelated grounds*, 517 U.S. 1206, remanded to 101 F.3d 325 (4th Cir. 1996).

24

empowering the Commissioner to determine whether the sale was commercially reasonable, and if so, giving him discretion to "enter an order disallowing any claim for a deficiency balance."  CL § 12-1021(j)(3).

Thus, in 1987, the Maryland legislature built two distinct subsections of § 12-1021 to address deficiencies following improperly noticed repossessions – one applies to public sales, the other to private sales.  The public sale statute uses the word "shall," while the private sale statute uses the word "may."  *Compare* CL § 12-1021(k)(4), *with* CL § 12-1021(j)(3).  The public sale deficiency prohibition never mentions the Commissioner; the discretionary private sale deficiency ruling can only be made by the Commissioner.  *Id*.  The public sale statute refers to "any deficiency *judgment* to which he [the credit grantor] would be entitled under the loan agreement," while the private sale statute preconditions a discretionary "order disallowing any claim for a deficiency *balance*" "[u]pon a determination that the [private] sale was not accomplished in a commercially reasonable manner."  *Id.* (emphasis added).

Under cardinal rules of statutory interpretation, CL § 12-1021(k)(4) along with CL § 12-1021(j)(3) must be read so that that no word, clause, sentence or phrase is rendered "meaningless, surplusage, superfluous, or nugatory."  *Office of People's Counsel v. Maryland Public Serv. Com'n*, 733 A.2d 996, 1007 (Md. 1999) (when construing a provision that is part of a statutory scheme, "neither the words in the statute nor any portion of that statutory scheme should be read 'so as to render the other, or any portion of it, meaningless, surplusage, superfluous, or nugatory.'") (quoting *GEICO v. Insurance Com'r*, 630 A.2d 713, 717 (Md. 1993)).  If CL § 12-1021(k)(4) were to apply to private sales, CL § 12-1021(j)(3) would be eviscerated.

Consistent with these established statutory interpretation principles, plaintiff's claim seeking a declaration that Wilmington is not entitled to a collect the deficiency balance under CLEC because the

repossession and sale notices are deficient fails as a matter of law.  CL § 12-1021(k)(4) simply does not apply when consumers complain about private sale repossession errors.  Accordingly, Wilmington is entitled to dismissal of Count III or, in the alternative, a declaration that CLEC does not prohibit a creditor from recovering a deficiency judgment against a borrower following a private sale, even if the repossession or sale notices are deficient.  The borrower's sole recourse in that situation is to pursue a claim with the Commissioner.

> **3.      Plaintiff's Claims For Unjust Enrichment And Restitution Are Subject To Dismissal Due To The Existence Of A Contractual Relationship Between Plaintiff And Wilmington.**

In Count IV, plaintiff alleges that "[b]y paying money on deficiency balances, interest, fees, [the alleged] costs and other charges claimed by Wilmington, [plaintiff] conferred a benefit of these illegally collected charges upon [Wilmington]" and that "Wilmington's collection, acceptance and retention of these charges . . . is and was and continues to be unjust and inequitable."  Compl., ¶¶ 75 and 77. Plaintiff's claims for unjust enrichment and restitution fail because of the existence of a written contract between plaintiff and Wilmington and because he has not and cannot allege any unjust benefit he has conferred on Wilmington.

Maryland law is clear that claims for restitution and unjust enrichment only lie in the absence of a written contract between the parties.  *See Ver Brycke v. Ver Brycke*, 843 A.2d 758, 772 n.9 (Md. 2004) ("'[T]he general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.'") (quoting *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607 (Md. 2000)).  As the Maryland Court of Appeals has explained:

> The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on

> which the quasi-contractual claim rests.  [citations omitted]  The reason
> for this rule is not difficult to discern. When parties enter into a contract
> they assume certain risks with an expectation of a return. Sometimes, their
> expectations are not realized, but they discover that under the contract they
> have assumed the risk of having those expectations defeated. As a result,
> they have no remedy under the contract for restoring their expectations. In
> desperation, they turn to quasi-contract for recovery. This the law will not
> allow.

*J. Roland Dashiell & Sons,* 747 A.2d at 607; *see also WRH Mortgage, Inc. v. S.A.S Assocs.*, 214 F.3d

528, 534 (4th Cir. 2000) ("Where a contract governs the relationship of the parties, the equitable remedy

of restitution grounded in quasi-contract or unjust enrichment does not lie."); *Odyssey Travel Ctr., Inc.*

*v. Ro Cruises, Inc.*, 262 F. Supp. 2d 618, 626 (D. Md. 2003) (same).

Plaintiff impermissibly presses his claims for unjust enrichment and restitution for fees and

charges even though he admits in the complaint that those fees and charges arise from the RIC between

him and Wilmington (as assignee).  Compl., ¶¶ 9-10.  That contract permits Wilmington to repossess

plaintiff's vehicle upon default, to sell the vehicle and to pursue a deficiency balance.  Ex. A (RIC,

¶¶ 3.d and 3.f) to Compl.  Accordingly, the existence of a written contract between plaintiff and

Wilmington (and the absence of any allegation of fraud or bad faith) requires dismissal of Count IV for

failing to state a claim upon which relief can be granted.  *See Kwang Dong Pharm. Co. v. Han*, 205 F.

Supp. 2d 489, 497 (D. Md. 2002) (where there is a contract, an unjust enrichment claim "requires the

plaintiff to plead fraud or bad faith" to survive dismissal).

Even if plaintiff could clear this hurdle, his unjust enrichment and restitution claims would still

fail because he cannot establish that he enriched Wilmington unjustly.  The elements of an unjust

enrichment claim are that the plaintiff conferred a benefit upon the defendant, that the defendant knew

of the benefit and that the defendant accepted or retained the benefit under circumstances that make it

inequitable to permit the defendant to keep the benefit.  *J. Roland Dashiell & Sons*, 747 A.2d at 607 n.7

27

(citing *Everhart v. Miles*, 422 A.2d 28, 31 (Md. Ct. Spec. App. 1980)).  Here, plaintiff claims that Wilmington assessed and collected deficiency balances that it was not entitled to receive.  However, as explained in Section B.2 *supra*, nothing in CLEC prohibits Wilmington from recovering a deficiency judgment against plaintiff following a *private* sale, even if the repossession or sale notices were deficient.  At most, plaintiff alleges that: (1) he purchased a new 2009 Ford Fusion; (2) the RIC was assigned to Wilmington, who assumed the contract and received monthly payments; (3) Wilmington repossessed the Ford Fusion; (4) Wilmington notified plaintiff of the impending private sale and redemption price; and (5) Wilmington sold the collateral at a private sale and sent plaintiff a post-sale notice detailing the deficiency.  Compl., ¶¶ 9-20.  These allegations are insufficient to plausibly demonstrate, much less allow an inference, that plaintiff paid and Wilmington accepted any "illegal" charges.  Consequently, plaintiff has failed to state a claim for unjust enrichment or restitution, and Count IV is therefore subject to dismissal as a matter of law.

### 4.   Plaintiff Has Failed To State A Viable Claim Under Maryland's CPA.

In Count V of the complaint, plaintiff attempts to assert a claim under the Maryland CPA.  As with his other claims, plaintiff's CPA claim is premised on the same alleged violations of CLEC he asserts in Count I.  Plaintiff claims that the alleged defects in the repossession and sale notices misled and deceived consumers and violate the CPA.  Because a violation of CLEC is not a *per se* violation of the CPA and because plaintiff does not allege any actionable misrepresentation or omission, plaintiff has failed to state a claim under the CPA upon which relief can be granted.  To the extent plaintiff bases his CPA claim on alleged reports by Wilmington to credit reporting agencies, his claim is preempted by application of the federal Fair Credit Reporting Act.

      **a.**    **Plaintiff's CPA Claim Fails Because A Violation Of CLEC Is Not A *Per Se* Violation Of The CPA.**

The CPA identifies more than two dozen statutes that, if violated, automatically constitute a violation of the CPA.  CLEC, however, is not one of them.  *See* CL § 13-301(14)(ii)-(xxvii) (listing certain statutes, the violation of which also constitutes a violation of the CPA).  At least one Maryland court has held that a violation of CLEC is ***not*** also a violation of the CPA.  *See, e.g., In re Pittman*, 165 B.R. 586 (Bankr. D. Md. 1994) (rejecting argument that violations of CLEC constitute a *per se* violation of CPA, explaining that "Plaintiff did not cite any authority for the proposition that violations of the Creditor Grantor Closed End Provisions are *per se* violations of the Consumer Protection Act, and this Court has found none.").  Accordingly, to the extent plaintiff's CPA claim is based entirely on the alleged violations of CLEC (and not on independently unfair and deceptive conduct), it fails as a matter of law.

      **b.**    **Plaintiff Has Failed To Allege Facts Showing An Actionable Misrepresentation Or Omission.**

Plaintiff's CPA claim rests upon the incorrect premise that CLEC prohibits a creditor from recovering a deficiency judgment against a borrower following a *private* sale if the post-repossession notice is deficient in any respect.  Based on this premise, plaintiff claims that Wilmington violated the CPA when it "notified the Class Representative . . .  in writing that [he] owed deficiency balance[] which  . . . [he] did not owe and which Wilmington Trust could not collect due to its failure to comply with [the notice requirements of] CLEC."  Compl., ¶ 84.  Because plaintiff's premise is incorrect, so too is his conclusion.  As explained in Section B.2, *supra*, CLEC does not prohibit a credit grantor from recovering a deficiency against a borrower following a *private sale*, even if the post-repossession or sale notices are deficient.  The prohibition to collecting a deficiency judgment set forth CL § 12-1021(k)(4) applies only to public sales.  Because plaintiff's vehicle was sold in a private sale, Wilmington's notice

29

to plaintiff advising of its right to collect the deficiency balance does not contain any actionable misrepresentation or omission.  To the contrary, the notice is legally correct.

        **c.**    **Plaintiff's CPA Claim Is Preempted By The Fair Credit Reporting Act To The Extent The Claim Is Based On Reports To Consumer Reporting Agencies.**

Plaintiff also claims that "in violation of the CPA . . . Wilmington made false and misleading reports to credit reporting agencies regarding the amounts which the Named Plaintiff and member of the Repossession Class owed on their accounts."  Compl., ¶ 88.  This bald assertion falls far short of the pleading requirements set forth in *Iqbal* and *Twombly*.  *See Iqbal*, 129 S. Ct. at 1949 ("A pleading that offers 'labels and conclusions' . . .  will not do.'") (quoting *Twombly*, 550 U.S. at 555).  In addition to plaintiff's deficient pleading, nothing in CLEC prohibits Wilmington from reporting to a consumer reporting agency the undisputed facts that plaintiff defaulted on his loan and that plaintiff's car was sold after repossession.  The legislature enacted CLEC to establish certain procedures for issuing credit and collecting debts.  *See Biggus v. Ford Motor Credit Co.*, 613 A.2d 986 (1992).  It did not enact CLEC to mislead subsequent creditors or to remediate the credit reports of delinquent debtors.

Moreover, to the extent plaintiff's claim under the CPA is based on Wilmington's reporting of allegedly erroneous information to consumer reporting agencies, that claim is preempted under the federal Fair Credit Reporting Act ("FCRA").  Specifically, Section 1681t of the FCRA preempts state statutory claims based on conduct of furnishers to consumer reporting agencies of credit information, which Wilmington is alleged to be:

        No requirement or prohibition may be imposed under the laws of any State—

            (1) with respect to any subject matter regulated under—

                    *      *      *

> (F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply–
>
> > (i) with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on September 30, 1996); or
> >
> > (ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996).

15 U.S.C. § 1681t(b)(1)(F).  Courts have interpreted this section to expressly preempt suits under state consumer protection laws against persons who furnish information to consumer reporting agencies. *Howard v. Blue Ridge Bank*, 371 F. Supp. 2d 1139, 1143-44 (N.D. Cal. 2005) (granting motion to dismiss California consumer protection act claim because preempted by FCRA); *Riley v. General Motors Acceptance Corp.*, 226 F. Supp. 2d 1316, 1322 (S.D. Ala. 2002) ("there is no question that the statutory prohibition [of the FCRA] precludes suits under state consumer protection laws"); *Jaramillo v. Experian Info. Solutions, Inc.*, 155 F. Supp. 2d 356, 362 (E.D. Pa. 2001) (granting motion to dismiss because section 1681t(b)(1)(F) of the FCRA preempts Pennsylvania's consumer protection law); *Carney v. Experian Info. Solutions, Inc.*, 57 F. Supp 2d. 496, 503 (W. Tenn. 1999) (granting motion for judgment on pleadings on grounds that FCRA preempts Tennessee's Consumer Protection Act to the extent that the state statute provides a private cause of action against furnishers of information in conflict with the FCRA's enforcement scheme).

Here, plaintiff alleges that Wilmington violated the CPA by reporting "false and misleading reports to credit reporting agencies." Compl., ¶ 88.  Such alleged conduct squarely falls within the scope of 15 U.S.C.A. § 1681s-2 of the FCRA and therefore is expressly preempted by the FCRA. *See* 15 U.S.C. § 1681t(b)(1)(F).  Accordingly, even if plaintiff has alleged sufficient facts to support a claim

under the CPA, that state statutory claim is preempted as a matter of federal law and should be dismissed.[11]

### V.  CONCLUSION

For the reasons set forth herein, plaintiff's complaint fails to state a claim upon which relief can be granted, and Wilmington Trust FSB is therefore entitled to dismissal of this action as a matter of law.

Respectfully submitted,

_____
                /s/
Brian L. Moffet (Fed. Bar No. 13821)
John Y. Lee (Fed. Bar No. 28313)
GORDON, FEINBLATT, ROTHMAN,
  HOFFBERGER & HOLLANDER, LLC
The Garrett Building
233 East Redwood Street
Baltimore, Maryland  21202-3332
Telephone No.: 410/576 - 4197
Fax No.: 410/576 – 4269
Email: bmoffet@gfrlaw.com
Email: jlee@gfrlaw.com
*Attorneys for Defendant*
*Wilmington Trust FSB*

---

[11] Plaintiff's CPA claim fails for the additional reason that plaintiff has not sustained any actual injury or damage as a result of Wilmington's alleged conduct.  *See Citaramanis v. Hallowell*, 613 A.2d 964, 968 (Md. 1992) ("It is manifest from the language employed in [subsection (a) of § 13-408 of the CPA] that the General Assembly intended that a plaintiff pursuing a private action under the CPA prove actual 'injury or loss sustained.'").  In his complaint, plaintiff alleges that "[a]s a result of [Wilmington's] unfair and deceptive trade practices in violation of the CPA, the Class Representative [plaintiff] . . . was induced to make payments to Defendant [Wilmington] on deficiency balance[], causing the Class Representative . . . injury or loss."  Compl., ¶ 87.  This is not factually accurate.  Plaintiff did not make any payments to Wilmington on the deficiency balance.  Because this is a motion to dismiss and because the court must assume the truth of plaintiff's allegations, Wilmington is not seeking dismissal of the CPA claim on this basis.  However, to the extent plaintiff's CPA claim survives, plaintiff should be ordered to show cause as to the good faith basis for alleging as a matter of fact that he made payments to Wilmington towards the deficiency balance.